## THE STATE v. CLARENCE A. RUCKMAN, Appellant.

### Division Two, December 9, 1913.

1. **ARSON: Intent to Defraud Insurer: Proof of Insurer's Incorporation Not Necessary.** In a prosecution for arson committed with intent to defraud an insurer it is not necessary to prove that the insurer was a corporation.

2. ———: ———: **Evidence: Circumstantial: Motive.** Evidence of motive is admissible as furnishing one link in the chain of circumstances tending to establish guilt, but mere showing of

motive, uncorroborated by other facts and circumstances incon-
sistent with innocence, is not sufficient prima-facie showing to
authorize the submission of defendant's guilt to the jury.

3. **EVIDENCE: Criminal Law: Suspicion.** Mere suspicion, how-
ever strong, will not supply the place of evidence when life or
liberty is at stake.

4. ————: ————: ————: Proof: Defendant's Pres-
ence at and Participation in Corpus Delicti. The rule in
criminal cases is that the burden of proof never rests on the
accused to show his innocence or to disprove the facts neces-
sary to establish the crime with which he is charged. The de-
fendant's presence at and his participation in the *corpus delicti*
are affirmative material facts that the prosecution must show to
sustain a conviction.

5. ————: ————: Evidence: Appeal. Evidence in a prosecu-
tion for arson with intent to defraud an insurer *held* insuf-
ficient to support a conviction.

Appeal from Jefferson Circuit Court.—*Hon. E. M.
Dearing*, Judge.

REVERSED AND REMANDED.

*H. B. Irwin* and *S. G. Nipper* for appellant.

(1) There is no testimony in this case tending
in any way to show that the Washington-Providence
Insurance Company was a corporation. This may be
shown by general reputation, but there is nothing in
the record to show it even in this way. State v. Jack-
son, 90 Mo. 156; Steele v. Tucker, 84 Mo. 23.   (2) The
first instruction given by the court submitted to the
jury the province of finding the defendant guilty if
he "wilfully and maliciously" burned the property
and allowed them to find him guilty of a felony with-
out finding that it was done "feloniously." It is the
duty of the court to define the offense accurately in
concise language and tell the jury the essential facts
necessary to be found in order to authorize a convic-
tion. State v. McClosky, 104 Mo. 644; State v. Heinze,
66 Mo. App. 135. Where the evidence is wholly cir-

cumstantial the jury should be instructed that they should not convict unless the State has proved his guilt from the evidence beyond a reasonable doubt from the facts and circumstances, all of which are consistent with each other and with his guilt, and absolutely inconsistent with any reasonable theory of his innocense. State v. Moxley, 102 Mo. 374; State v. Woolard, 111 Mo. 248. The court clearly erred in admitting the evidence of the witness Mann, that Ruckman had tried to borrow money from him some time in June, 1911. This was clearly prejudicial and could serve no purpose except to prejudice the minds of the jury. There is not sufficient testimony in this case to warrant a conviction and the court should have given the instruction in the nature of a demurrer, as there is no evidence upon which to base a verdict of conviction. State v. Wall, 39 Mo. 534; State v. Prendible, 165 Mo. 353; State v. Huff, 161 Mo. 487; State v. Burgdorf, 53 Mo. 65; State v. Primm, 98 Mo. 368.

*John T. Barker*, Attorney-General, and *William M. Fitch*, Assistant Attorney-General, for the State.

(1) The corporate existence of this company is not drawn in question and has not become material in the case. It is good pleading to allege the company was incorporated, if it was a corporation, but by Sec. 5230, R. S. 1909, it is expressly provided that the provisions of law in civil cases relative to the enforcement of the limitations and the protection of the rights of the parties shall extend to criminal cases so far as they are in their nature applicable thereto, subject to the provisions in any statute. Applying this rule we refer the court to Sec. 1985, R. S. 1909, where it is expressly provided, it shall not be necessary to prove the fact of the incorporation of a corporation or the organization and component members of a partnership unless the opposite party put such fact in issue

by affidavit filed with the pleadings in the cause, but the court will notice that this issue can only be made where the question of incorporation or partnership is a direct issue in the case. We therefore hold that if such had been a direct issue in this case then the State would not be required to make proof of the incorporation of the company unless the matter had been drawn in issue by an affidavit filed as provided by section 1985, in civil proceedings. But the question of the incorporation of the insurance company is entirely a collateral issue in this case. The only direct issue in the case under the information was whether or not the defendant was guilty of arson as charged in the information. All other questions in the case, aside from this, are mere collateral matters and therefore cannot bear upon this question. (2) Appellant next complains of the first instruction given by the court and cites cases to support his assignment of error. From a reading of those cases and from a careful consideration of this instruction, we beg to submit that the instruction is not subject to the criticism offered by appellant. In fact, we hold this instruction is absolutely free from criticism and is a flawless declaration of the law. (3) Appellant next complains of the failure of the court to submit a proper instruction concerning circumstantial evidence and cites cases thereunder. Instruction number two given by the court comes clearly within the rule announced by the cases cited by appellant. In fact, the main portion of that instruction is taken from the case of State v. Moxley, 102 Mo. 388, being the case first cited and relied on by appellant. This instruction is well enough and clearly covers the law concerning the source and effect to be given to circumstantial evidence. There was no error on the part of the court in giving same. (4) Defendant next says there is not sufficient testimony in this case to warrant a conviction and complains because the court refused to sustain his demur-

rer to the evidence in this case. Appellant cites several cases under this point, but, without discussing the matter, we respectfully submit that the evidence amply justified the court in submitting the cause to the jury, and is amply sufficient to sustain the finding of the jury and the judgment of the court. We respectfully refer this court to the recent case of State v. Concelia, 250 Mo. 411, and the brief in that case, which was filed on the part of the respondent, where we carefully discussed the weight and force to be given to circumstantial evidence. Upon the rule announced in that case, we are confident that the evidence in this case is abundantly sufficient to sustain the conviction of defendant.

WILLIAMS, C.—The count of the information upon which defendant was tried charged arson in the third degree, as defined by section 4511, Revised Statutes 1909. Trial was had in the circuit court of Jefferson county, Missouri. Defendant was convicted and his punishment assessed at two years in the penitentiary. The evidence upon the part of the State tends to show the following facts: On the 25th day of January, 1912, and for some months prior thereto, defendant was engaged in running a pool and billiard hall at De Soto, Missouri; about three o'clock a. m., on said day, fire was discovered in said pool room. B. J. Peasley testified that, as he got off a train at the depot in the town of De Soto, he saw the fire break out the front windows of the pool room and that the blaze shot nearly across the street and looked like oil was burning. Mr. Herman Hamel, the owner of the building, testified that defendant occupied the first floor for a pool room and that the second floor was occupied by different offices. The front of the building opened on Main street and just back of the building was a small warehouse and in the rear of the warehouse was a back yard and back of that was the alley;

on the north side of the pool room was a building the
lower floor of which was occupied by a clothing store
and the upper portion as a family residence; the build-
ing on the south side of the pool hall was used as a
dwelling; the pool room had three doors, a front door,
one back door into the warehouse and a side door which
entered the pool hall from an outside hallway. Wit-
ness first went down to the scene of the fire about
seven o'clock a. m., and at that time found that the
pool tables and billiard tables were nearly destroyed
by fire; that there was some kindling around the legs
of the pool tables, and that behind the last pool table
was an empty whisky barrel containing some coal oil
and a pan. Witness further stated that the scent of
coal oil was strong in the building and that he noticed
some oil out in the outside hall and that the pool room
floor was burned out. A. J. Blair, justice of the peace
and fire insurance agent, testified that on May 1, 1911,
he insured defendant's pool tables and fixtures and
delivered to defendant an insurance policy in the Prov-
idence-Washington Insurance Company, for a term
of one year. The total insurance was thirteen hun-
dred dollars, divided as follows: eleven hundred and
fifty dollars on four tables, balls, cues, cue racks, cus-
pidors and chairs; fifty dollars on show cases and
stock of cigars; one hundred dollars on lighting plant.
The policy provided that, in the event of loss, no table
was to be valued at more than two hundred and ten
dollars; loss, if any, under the policy, was made pay-
able to the Kansas City Billiard Table Manufacturing
Company, mortgagee, as their interest might appear.
Before issuing the policy of insurance, the witness
looked at the property and ascertained the value of
the same for the purpose of insurance; that he was
at the building for a short time, about eight o'clock on
the morning of the fire, and found the four pool ta-
bles badly damaged by the fire and the pool room floor
was badly burned and saw the whisky barrel in the

pool room. On being asked if he noticed any coal oil around there, he said: ''I don't know exactly, there was something in a tin can there, and there was something in the barrel with some kindling in there. I suppose there was some water among the coal oil.'' He further testified that he noticed some coal oil on the wall in the hallway, to the left of the steps leading upstairs; that he saw some kindling under one of the pool tables; that the defendant lived at the Commercial Hotel, which was eighty or ninety feet south of the poolhall. That in the rear of the hotel was an incline runway, leading from the alley to the second floor of the hotel, up which trunks were moved to the sample room on the second floor; that at the time of the issuing of the insurance, defendant told him that the tables were mortgaged for six hundred dollars; that, shortly before the fire, defendant asked witness to find him a buyer for the property; the witness thought defendant made one price of $400. (This was evidently for the defendant's equity in the property, but the evidence does not so show.) W. A. Welch, chief of the De Soto fire department, testified that he went to the fire and found the front of the room all ablaze and that the flames from the fire shot out about half way across the street. The fire department put the fire out and found that the floor was burned out and the ceiling broken through in several places; some kindling wood was found in the pool room, stacked up around the pool tables and in rows under the tables; that he smelled coal oil in the building and that ''it seemed to be everywhere.'' He also found a whisky barrel in the back part of the pool room and said that the door going from the pool room into the outside hallway was open. That the defendant came to the fire shortly after the fire department arrived and that witness directed defendant to take hold of one of the nozzles and turn it upon the fire. James Couch, liveryman, and member of the fire department, attended

the fire; had charge of the hose in the rear of the building; saw some pine kindling, split up so as to go into a stove, under the pool tables and around the legs. He did not see any oil, in any part of the building, but testified that the building was so badly burned that there was no oil there, except what was in the barrel. John Anderson, a driver of a transfer wagon, testified that some time during the last part of December, 1911, he hauled one half load of kindling for defendant and delivered it at the rear of defendant's place of business; that it was the same kindling that he hauled for many other citizens of the town at that time of year. A. Rush testified that he was the son of the lady who conducted the Commercial Hotel at De Soto; that defendant lived at the hotel in room twenty-four on the third floor; that a few days before the fire he cut up some kindling for the defendant and stacked the kindling in the warehouse; that he had never seen a coal oil lamp in the pool room; that he saw some of this kindling under the pool tables after the fire; that the door to the sample room on the second floor of the hotel is supposed to be kept closed; that on the night of the fire he occupied room twenty-three at the hotel, which room is separated from the room that defendant occupied by the stairway leading down to the second floor; that he heard nothing during the night, until he heard the porter call the defendant and give the fire alarm and that after he got to the fire he saw the defendant there. That he did not know when defendant went to bed; that the pool room was heated with a coal stove and lighted with gas lights; the gas being supplied by an individual gas plant, the tank of which was in the corner of the pool hall; that the kindling he cut for defendant was for use in the stove and that there was no attempt to conceal the splitting of the kindling; that defendant had nothing to do with the sample room but that the sample room was used for storing canned goods and

bed clothes at this time; that there were only two ways to go from the third floor of the hotel to the yard in the rear of the hotel: One way was to go down the front stairs and through the office, the other way was to go down the back steps and through a door leading into the kitchen and then through a door leading from the kitchen into the back yard and that the kitchen door was generally locked. William Spiker, night clerk at the Commercial Hotel, testified that he was on duty as night clerk on the night of the fire; that about one o'clock a. m., defendant came to the hotel and went upstairs to bed; that about three o'clock, witness went up to defendant's room and knocked on the door; that defendant answered him, and that he told defendant that his pool room was on fire. Witness then went down stairs to the hotel office and after remaining there about five minutes went back up to defendant's room and kicked on the door; that defendant got up and came to the door and witness told him that his pool room was on fire and that defendant said: "How in the deuce did it get on fire this time of night?" That thereupon defendant put on his shoes and trousers and then his overcoat and hat and went to the fire. Witness further testified that he was awake and on watch, at the hotel, from the time that defendant went to bed until the fire broke out and was positive in his statement that defendant did not leave the hotel, after he came in at one o'clock, until he called him at three o'clock; that if defendant had gone out of the building by going through the sample room he thought he could have heard him. D. L. Rouggly, a fire insurance agent, testified that he was in the building and found the head of the above mentioned whisky barrel in the cellar, under the pool room. C. K. Perdue, manager of the Commercial Hotel, testified that a person could go through the old sample room and down the incline at the rear of the hotel into the alley; that the door leading from the back stairs into the kitchen

was fastened with a common door lock; that the door
leading from the kitchen into the back yard was fas-
tened with a bolt on the inside; that there was noth-
ing to indicate that the door leading from the sample
room out to the incline had been opened that night.
F. M. Polk, saloon keeper, identified the empty whisky
barrel, which was found in the pool room, as one which
he had missed from his place of business about a
month before. Pat Ennis testified that he was in de-
fendant's pool room the night of the fire, about 11:30,
when defendant "closed up" and that defendant, to-
gether with witness and two or three other persons,
went to a near-by saloon and from there to a restau-
rant across from the depot and that the crowd then
went over to the depot and that they separated about
one o'clock a. m., the respective members of the party
going in the directions of their homes; the defendant
going toward the hotel. That he did not see the empty
whisky barrel in the pool room when defendant closed
up. Jake Englehart testified that he was conducting
a pool room in Crystal City and that some time before
the fire, defendant came to Crystal City, upon the in-
vitation of witness, and witness offered defendant
eight hundred dollars for the pool room but defend-
ant refused to take it, saying that he wanted more.
Charley Burrus testified that he was engaged in run-
ning a pool hall at De Soto and that about two months
before the fire defendant offered to sell him his equity
in the place for seven hundred dollars, saying that
there was a mortgage against it for five hundred dol-
lars and that would make the total selling price twelve
hundred dollars. Robert Filkins testified that he was
in defendant's pool room when it was closed for the
night, about 11:30, and that he did not see the whisky
barrel in the pool room at that time. Ralph Carson
testified that the whisky barrel was not in the pool
room on the evening before the fire. George Mahn, a
real estate dealer, testified that in June, 1911, defend-

ant wanted to borrow some money from him to make some monthly payment on the pool tables, saying that business was dull at that time and that he had not made enough to make his monthly payment, but witness would not make the loan. Ed Alderson, city marshal of De Soto, testified that he arrested defendant at two p. m., on the day of the fire, and that upon being arrested defendant said: "That is h—; I guess I am in for it now," and that a little later defendant passed Charley Perdue and said, "Charley, by G—, they've got me." This was all the evidence introduced by the State. The defendant then introduced the following testimony: Frank Moon, night marshal of the city of De Soto, said that he saw the defendant, with several other fellows, at the restaurant and depot, on the night of the fire, and that about five minutes before one o'clock he met the defendant about one-half block from, and going toward, the Commercial Hotel; that he saw the fire about the time that it broke out, at three a. m., and ran across the street to the restaurant and called the fire department and then ran up to the pool hall and looked to see if there was anyone around the building and then went to the hotel and saw the night clerk sitting behind the cigar case which was about the center of the office in the hotel and just beneath the sample room on the second floor. Witness told the night clerk to go up and call the defendant; that the night clerk first tried to get central, but being unable to do so immediately, ran upstairs to arouse defendant. Harry Maupin testified that he was one of the fellows in defendant's place of business at closing time and that the defendant and the others went from the pool hall to the saloon, then to the depot and restaurant. Defendant took the stand in his own behalf and testified that since April, 1912, he had been traveling for the Kansas City Billiard Table Manufacturing Company; denied setting fire to

the pool tables and denied having any connection with the cause of the fire, and said that he had no knowledge of the fire until the night clerk knocked on his door; that he went to bed at one o'clock and never left his room until the night clerk called him at three o'clock. Defendant was not cross-examined. That was all the evidence in the case and defendant renewed his request for a peremptory instruction which the court overruled, and to which ruling defendant saved an exception.

## OPINION.

I. It is contended that the evidence fails to prove that the Washington-Providence Insurance Company was a corporation and that it was necessary for the State to prove that fact. In prosecutions for arson in the third degree as defined by section 4511, Revised Statutes 1909, it is not necessary to prove that the insurer is a corporation. [State v. Steinkraus, 244 Mo. 152, and cases therein cited.]

*Arson: Defrauding Insurer: Proving Incorporation.*

II. It is next contended that the evidence is not sufficient to sustain the conviction. Because of the fact that this is the important question involved in this appeal, we have, in the foregoing statement of facts, set forth the evidence more in detail than would be necessary were the sufficiency of the evidence not involved.

*Evidence.*

The testimony as to the odor of coal oil in the burning premises and the arrangement of the kindling about the pool tables, would tend to show that the fire was caused by a criminal agency rather than by natural or accidental causes.

The evidence also tends to show that, at the time of the fire, the insurance upon the pool tables was in excess of the price at which defendant had recently

offered to sell. This was some evidence of a motive upon the part of the defendant to do the criminal act. There was also some evidence that "if" defendant had gone with his shoes off, he might have been able to go from his room on the third floor of the hotel down the stairway to the second floor and out through the sample room thereon located and from there down the incline to the alley, in the rear of the hotel, without being detected by the night clerk of the hotel. This, at most, would only show a possible opportunity the defendant had to commit the crime without being detected. But is the mere fact that defendant had a motive for causing the fire, and a possible opportunity to have carried out such a motive, a sufficient showing to warrant the jury in finding that, in fact, he did carry out such motive and cause said fire. We think that such a showing is not sufficient. Evidence of motive

**Motive.** is admissible, as furnishing one link in the chain of circumstances, tending to establish guilt, but mere showing of motive, uncorroborated by other facts and circumstances inconsistent with innocence, is not sufficient prima-facie showing to authorize the submission of defendant's guilt to the jury. It would be a rather unjust and dangerous rule that held that the mere showing of motive and opportunity would overcome the presumption of defendant's innocence and establish, beyond a reasonable doubt, his participation in the criminal act. Aside from the showing of a possible motive, there is no other fact or circumstance which, in any way, points towards defendant's guilt. On the other hand, the State's own evidence tends to show that the defendant did not cause the fire. The evidence shows that at about three o'clock a. m. the flames burst out suddenly, indicating the presence of oil and therefore a quick fire; that defendant left the pool hall at closing time, in company with some of the State's witnesses and after an hour or two of time, all of which is fully accounted for,

the defendant entered the hotel at one o'clock a. m., and did not again leave the hotel until he was awakened by the night clerk at three a. m. and informed that his pool room was on fire.

It may be admitted that the finger of suspicion might point to the defendant, but, as was well said in the case of State v. Jones, 106 Mo. 302: "Mere suspicion, however strong, will not supply the place of evidence when life or liberty is at stake."

**Suspicion.**

Furthermore, "The rule in criminal cases unqualifiedly is that the burden of proof never rests on the accused to show his innocence or to disprove the facts necessary to establish crime with which he is charged. The defendant's presence at and his participation in the *corpus delicti* are affirmative material facts that the prosecution must show to sustain a conviction." [Wharton's Criminal Evidence (10 Ed.), sec. 160a.]

**Presence and Participation.**

In discussing the weight to be given evidence showing a motive the same learned author says: "The presence or absence of motive in cases depending wholly on circumstantial evidence is not a factor that determines either the guilt or innocence of the accused. Proof of motive does not establish guilt nor want of it establish innocence." [Id., sec. 878.]

In the case of State v. Morney, 196 Mo. 43, in discussing the sufficiency of circumstantial evidence to sustain a conviction of arson, the court, speaking through BURGESS, P. J., said: "It matters not that there was no evidence to show that some other person than defendant committed the crime. That there was opportunity for some other to do so cannot be gainsaid. Taking all the facts in evidence, they do not even make out a prima-facie case against the defendant. He was not shown to have been guilty of any incriminating act and it requires stronger and more cogent circumstantial evidence of his guilt than

was adduced upon the trial in order to maintain the judgment. . . . Where a chain of circumstances leads up to and establishes a state of facts inconsistent with any theory other than the guilt of the accused, such evidence is entitled to as much weight as any other kind of evidence but the chain, as it were, must be unbroken and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction. In this case there was an entire absence of one important link in the chain of evidence; that is, there was no evidence that the defendant was present at the building at the time it was fired. At most the evidence adduced only raised a suspicion against the defendant, and under such circumstances no conviction for crime should be allowed to stand."

All the facts and circumstances shown by the State's evidence could exist and yet the defendant be innocent of any crime. The evidence as a whole leaves too much room for doubt and mistake and does not possess sufficient proof of guilt to authorize the State to deprive defendant of his liberty.

If upon another trial the State is not able to produce additional evidence of defendant's guilt the trial court should direct an acquittal.

The judgment is reversed and the cause remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.