**STATE of Missouri, Respondent,**

v.

\Anthony FERRARA, Appellant.

No. 46297.

Supreme Court of Missouri,
Division No. 2.

Dec. 8, 1958.

Opinion Modified on Court's Own Motion
and Rehearing Denied Jan. 12, 1959.

Motion for Rehearing on Modification of
Opinion and Transfer to Court en
Banc Denied Feb. 9, 1959.

Joseph N. Miniace, Louis J. Pelofsky, Kansas City, for appellant.

John M. Dalton, Atty. Gen., W. H. Bates, Sp. Asst. Atty. Gen., for respondent.

LEEDY, Judge.

This is a prosecution for burning insured goods, wares, merchandise and other chattels and personal property with intent to injure or defraud the insurers, the felony denounced by section 560.030, RSMo 1949 and V.A.M.S. Upon a trial in the Circuit Court of Jackson County, appellant (hereinafter referred to as defendant or accused) was found guilty and sentenced to a term of three years in the penitentiary, and he appeals.

The principal point relied on by defendant is a challenge of the sufficiency of the evidence to support the verdict, and this necessitates an extended statement of the facts, the evidence relied on by the state being circumstantial. Defendant operated a fruit market and small grocery at 3811 Blue Parkway in Kansas City. The building, owned by another, was originally a gasoline filling station which had been moved to the premises and converted for the use just mentioned, the east side thereof (under a canopy, as we understand it) having been built up with concrete blocks where it had previously been open. The fire in question occurred at this market and was discovered a few minutes past 1:00 A.M., on September 21, 1955. A police officer, who was on

duty in the vicinity, testified that he heard a "sort of muffled sound * * * directly after that there was a rapid string of sounds * * * like a string of firecrackers set off all at one time." These sounds came from the south, the direction in which defendant's market was located. He proceeded at once in that direction by car, and upon arrival at the scene he found "flames were coming out all sides of the building * * * coming out from underneath the roof * * * ten or fifteen feet up above the edge of the roof. The whole inside of the building was afire." The east section, which was built of concrete blocks, had been blown out to the east. The only person he saw there at the time was "the man in the car by the building" (the watchman, defendant's brother-in-law). He had reported the fire to the police dispatcher by radio and the fire department arrived at the scene within three or four minutes after this witness got there.

The cook at a drive-in across the street from the market testified (in rebuttal) that about 1:00 A.M., his attention was attracted to the market by an explosion; that he looked up, and saw fire in the market building—"It looked like all over the building." He saw flames shooting up from the building, and heard glass flying out into the street a total distance of perhaps fifty feet. He, too, reported the fire.

There was evidence to the effect that fire was intense throughout the entire inside of the building with the exception of a little bathroom in the south part thereof. In the latter there was a "low fire" that had burned that area, but it was not charred as in the main part of the building. "The entire interior was a mass of flames" when the firemen arrived; the greatest concentration was on the southeast corner. The smoke given off by the fire was described as being unusual in that it was very dark, a characteristic of petroleum flame. The firemen fought the fire by standing on the east side of the building and directing the water through the hole in the east wall which apparently resulted from the explosion. It was through this hole that they later entered the building. The major portion of the fire was quickly "knocked down." That an explosion had occurred was further indicated by the fact that the concrete block east wall had been blown outward, to the east, and the front glass windows had been blown clear out onto (and some on the opposite side of) the four-lane U. S. Highway 50 in front of the store. There was debris all over the place.

Various witnesses testified to the presence of the odor of gasoline or other petroleum base products, particularly in the southeast corner where there was a sink. One witness testified that when he disturbed the debris under the sink, the gasoline odor was more pronounced. Specimens of debris were taken from the southeast corner, and subjected to laboratory analyses and tests. As to the result of these, a chemist testified such debris was found to contain a highly inflammable petroleum hydrocarbon—probably gasoline, the flame of which, upon a demonstration made before the jury, gave off a black carbon smoke. An expert testified that the effect of the fire "starting rapidly and all over the place" could not have been achieved without the use of an accelerant. And there was evidence on the part of the state to the effect that nothing was found in the stock of merchandise that would cause a fire to accelerate or cause a sudden burst of flames throughout the building. Three or four small cans of lighter fluid "which had been moved around by the hose streams" were found, but these were unopened. On the night in question a crew from the Gas Service Company made several different kinds of tests for gas leaks, which included the water heater, the overhead gas heater, and the gas line leading into the building, and no leaks were found. No container with gasoline or any type of petroleum in it was found, nor anything saturated with gasoline except the debris.

Defendant had no lease on the building. In fact, he purchased and took possession of the market without the knowledge of the owner of the building, who subsequently permitted defendant to continue operations apparently on a month-to-month tenancy. Defendant knew of the pendency of negotiations between the owner and a chain store looking toward the erection of a large building on the premises for the latter, which, if effectuated, would require defendant to vacate. It would appear, however, that the owner had indicated a willingness to erect a new structure for defendant's use in the same neighborhood. In this connection, it should be said there was evidence from which the jury could have found that the operation of the business was not profitable.

It is not disputed that in December, 1954, upon the solicitation of an insurance agent (called by the state, and who so testified) defendant took out two blanket policies of insurance aggregating $12,000 covering the contents of the building. Shortly before the fire the same agent solicited defendant to take out additional insurance to cover the supposedly increased values represented by the additions to stock and equipment, and such a policy for an additional $3,000 was issued on September 8, 1955, thirteen days before the fire.

The proof of loss made by defendant to the insurance companies claimed a loss of $21,000, a sum grossly in excess of the value of the insured property destroyed in the fire. When questioned at the scene of the fire on the night in question, defendant stated that he had insurance only to the extent of $3,000.

Defendant vigorously denied his guilt. He testified that he owned and operated the market for approximately a year before the fire, having purchased it from one Tony Maggio for $6,500, which sum represented the purchase price of the stock of goods and equipment; that the stock of goods was worth at that time approximately $3,000 to $3,500; that he increased the stock so that at the time of the fire there was merchandise in his place of business valued between $6,000 and $7,000; that he had also purchased additional equipment; that at the time of the fire "the equipment in my place was worth approximately, oh, $5,000." (It may be stated that in detailing the particular items of new equipment purchased by him he accounted for expenditures aggregating only $1,214, viz.: Refrigerated meat box or counter, $1,100; steak maker, $100; sealing iron, $14. It is true he testified he had expended $150 for awnings, and $300 or $400 for the concrete block extension to the building, but these items were not covered by the insurance policies, and so have no relevancy to that question. Defendant admitted that at the time of the fire he owed Franklin Ice Cream Company about $2,300 on equipment, and owed the bank $500 or $600 balance on the self-serve refrigerated meat counter he had added.

He testified that the interior portion of the market had been closed at about 6:00 A.M., on September 20 for the purpose of fumigation, a process accomplished by the use of two Aerosol "bombs." As we understand, the fresh fruit and vegetable portion of the business was carried on that day on an unenclosed porch whereon those commodities were ordinarily kept and displayed. The interior remained closed all day until about 6:00 P.M., when it was open for about one minute to permit defendant to go in and turn on the lights. The outer portion remained open until about 11:30 P.M., at which time defendant took the cash register inside and turned off the lights. His testimony was that he then drove home, some eight or nine blocks, and was in bed asleep when notified of the fire at 1:25–1:30 in the morning. In the latter connection he stated that "my wife wakes me up. She is very hysterical, and told me my brother-in-law was on the phone, and the place had burned." He then got up and "half way dressed * * * and went to the place of business." He was

corroborated by his wife, his brother-in-law and another employee with respect to the interior having been closed for fumigation, and his entry only momentarily for the purpose of turning on and off the lights and putting the cash register away. He had replaced his former night watchman with his own brother-in-law a relatively short time before the fire, but the night watchman did not have a key to the market. The only purpose of a watchman was to watch the produce on the porch.

Defendant introduced evidence to the effect that in the southeast corner of the building were certain inflammables, such as lighter fluid, cleaning fluid, charcoal lighter, waxes, polish, turpentine, etc., which, if ignited, would give off odors similar to gasoline. An Aerosol bomb was introduced by defendant, the label of which stated that of the active ingredients (totaling 20 per cent) 0.08 per cent thereof was petroleum distillate, but whether this was the same brand as those used in fumigating the premises did not appear. However, there was evidence on the part of the state to the effect that an Aerosol bomb would require a very high temperature to burn, if at all, and that, from an experiment conducted before the jury in which the spray from such a bomb would not ignite, but, on the contrary, put out a lighted match, it was indicated that it contained an ingredient rendering it non-inflammable.

There was testimony by defendant and his wife respecting the volume of business done by the market and the profits arising therefrom, which, if believed, might indicate that the operation was not unprofitable. However, this proof (if such it may be called) was of a most unsatisfactory and inconclusive nature, their indefinite estimates being confusing, contradictory and unsupported by anything except their own statements, and amounted to mere abstract assertions that business was good. It would serve no useful purpose to summarize the other evidence on defendant's part. The state, in rebuttal, offered certain sales tax records of the State of Missouri which indicated that he had only been operating for about half as long as he stated, that he had paid no sales tax for the year 1955, and that his gross receipts for the entire period from April through September of 1955 were $5,889.02.

We have no hesitancy in holding that the facts and circumstances concerning the fire as hereinabove detailed—the explosion, and the violence thereof, the quick-burning nature of the fire and its accompanying black carbon smoke, the chemical analysis of the distillate derived from the petroleum-soaked debris, and the absence of any gas leaks or natural cause for the fire—all point to, and are sufficient to support a finding of its incendiary origin.

■ Defendant cites, without expressly pointing out their particular applicability to the matters here urged, the following arson cases wherein the circumstantial evidence upon which convictions were had was held insufficient: State v. Paglino, Mo., 291 S.W.2d 850, 851, 856(7), 857; State v. Blankenship, 330 Mo. 792, 50 S.W.2d 1024, 1026; State v. Morney, 196 Mo. 43, 93 S.W. 1117, 1119; State v. Ruckman, 253 Mo. 487, 161 S.W. 705; State v. Goldstein, Mo., 225 S.W. 911; State v. Freyer, 330 Mo. 62, 48 S.W.2d 894, 899. Countering, the state cites these where the convictions were sustained: State v. Santino, Mo., 186 S.W. 976, 977; State v. Jackson, Mo., 267 S.W. 855, 856, 857; State v. Dworkin, 307 Mo. 487, 271 S.W. 477; State v. Berkowitz, 325 Mo. 519, 29 S.W. 2d 150; State v. Rudman, 327 Mo. 260, 37 S.W.2d 409, 410; State v. Lawrence Mo., 71 S.W.2d 740, 742. While defendant assigns generally the insufficiency of the proof to make out a case, his brief directs our attention to only two matters in that regard. The first of these supposed deficiencies is thus stated in the brief: "The defendant did not have the opportunity, either at 6:30 P.M., or at 11:30 P.M. to place any accelerate or any other substance

that might explode or burn in the far corner of said building, and the state failed to prove by any witnesses that the defendant was in the store for any length of time sufficient to place any instrument in said place of business to cause said fire." The contention presupposes that the state is bound by the testimony of defendant and his witnesses with respect to his going in and out of the interior portion of the market at the times admitted by him, which obviously is untenable. Defendant admitted that he was at the market throughout the day preceding the fire, and until 11:30 P.M., a little more than an hour and a half before discovery of the fire. Of course, this is not a case where the accused was seen running from the building after an explosion followed by fire, as in State v. Steinkraus, 244 Mo. 152, 148 S.W. 877, but this character of proof is not required, for the state may rely on circumstantial evidence to establish an accused's guilt of arson. State v. Blankenship, 330 Mo. 792, 50 S.W.2d 1024. This case points out that arson cases abound with testimony that accused persons were far away when the fires occurred, 50 S.W.2d loc. cit. 1026.

The other supposed insufficiency is that the proof failed to show a motive on defendant's part for setting the fire. We attach no controlling importance to the fact that the state's own evidence showed defendant was solicited by an insurance agent to take out the policies in question. The overriding facts which the jury would have been authorized in finding were that defendant was very considerably over-insured with respect to his stock of goods and equipment; he had no lease, and was aware of pending negotiations which, if carried out, would result in terminating his tenancy. These, coupled with the financially unprofitable nature of the market as a business, were sufficient on the question of the accused's motive.

What may seem to be the strongest case in defendant's favor is State v. Ruckman, supra, where, in addition to the incendiary nature of the fire, there was proof of motive on defendant's part and "possible opportunity" for him to have carried out such motive, and this was held insufficient. However, in that case the court was careful to point out that the *state's own witnesses* put defendant in his hotel room two hours before the fire, and that he did not again leave the hotel until he was awakened and informed of the fire. It is understandable, then, that in ruling as it did, the court observed: "On the other hand, the state's own evidence tends to show that the defendant did not cause the fire." 253 Mo. 487, 499, 161 S.W. 705, 708. If these matters are not borne in mind, it would hardly be possible to reconcile the later cases with the Ruckman case, notably State v. Dworkin, 307 Mo. 487, 271 S.W. 477, which was a prosecution against one of two proprietors of a furniture establishment for arson in the third degree (setting fire to goods and merchandise with intent to defraud the insurers thereof). The goods and merchandise were in a leased warehouse in which defendant and the other proprietor stored mostly old furniture, much of it worthless. A fire was discovered in the warehouse about 5 o'clock one morning burning in a barrel partly filled with straw and emitting a smell of gasoline. It was quickly extinguished. The firemen found nine large bottles or jugs of about five gallons capacity, each filled with gasoline, placed at intervals on the lower floor of the warehouse with a tail leading from where the fire was discovered to the jars. The jars were uncorked and a "necktie" of excelsior was tied around the neck of each of the bottles. The fire, when discovered, had not yet gotten to any of the jars. The primary question was defendant's agency in the crime. The court there recognized that arson may be committed by use of some contrivance or means to delay the actual burning after the matters have been set in motion which will eventually cause the destruction. The court deemed it of primary significance that no one other than the two owners had access to the warehouse, and the other owner was absent from the city.

That a stranger with no authorized access to the place could have gotten in the five-gallon jars half full of gasoline and distributed them without the knowledge of the defendant was deemed extremely unlikely. When arrested, the defendant stated there were only two keys to the warehouse; that he always kept one and the co-owner the other. At another time he stated there was a third key, which hung in the store and to which employees had access; that some employees had been discharged and the key afterward had. been missing. The defendant was so nervous that he could not unlock the safe when taken to the store following the fire. It was held that the evidence was sufficient to submit to the jury the question of defendant's agency in the crime.

◼ In the light of the facts establishing the corpus delicti, defendant's opportunity and presence of motive, and his disclaimer at the fire, when questioned, of having in excess of $3,000 insurance in force on the stock and equipment, makes out as strong a case as in Dworkin, supra, on the authority of which, if no other, we feel impelled to, and do hold that the question of defendant's agency in the crime was one for the determination of the jury, and in this conclusion we are buttressed by the other cases referred to above as having been cited by the state. Therefore, there was no error in denying defendant's motion for judgment of acquittal.

◼ The first of the remaining matters urged on this appeal, as raised by the motion for a new trial, is that the court erred in allowing an auditor in the Missouri Department of Revenue "to testify relative to sales tax without proof that the papers and documents were properly certified and authenticated by the seal of the Office of Treasurer or Auditor of the State of Missouri." Defendant invokes §§ 490.180, 490.190, RSMo 1949 and V.A.M.S., which make admissible in evidence copies of papers on file in the office of certain designated officers when certified under the seal

of those offices, respectively. But these sections do not by their terms purport to deal with the records and files in the Department of Revenue, nor did §§ 10 and 11 of C.S. for S.B. 297, Laws 1945, p. 1428 (since repealed—See Historical Note to § 136.010, V.A.M.S.) make them applicable, and this is a sufficient answer to the question as briefed. But apart from this, it is to be noted that these sections of the statutes deal with *certified copies* of official files and records in certain designated state offices, and respectively provide that when certified in the manner therein provided, the same "shall be evidence in all courts of this state" (§ 490.180)—"shall be received in evidence in the same manner and with like effect as the originals" (§ 490.190). The offending material here involved consisted of original files, not copies, and an objection to their competency under the foregoing sections as not having been certified was therefore properly overruled.

◼ The motion for new trial complained of two instances of allegedly improper argument by the prosecutor. In the first of these the prosecutor charged that the insurance agent put on the stand by the state was interested in the case on defendant's behalf. This was objected to for two reasons: (1) That the agent was the state's witness and it was chargeable with what he said; and (2) That he was not quoting his evidence correctly. The ruling of the court was: "The jury will recall what the evidence was, what the witness said." No further action was requested by defendant's counsel, who was apparently satisfied with the ruling. We find no prejudicial error in this incident. In the other of which complaint is made, the objection was sustained, and the jury instructed to disregard the following: "If you believe he is guilty in this case, you will not do him any favor if you acquit him because once a man commits a crime and gets away with it, he will—(interruption by defendant's counsel)." Nor do we find anything in the latter incident which calls for a reversal.

We have considered all of the assignments preserved by the motion for a new trial, as well as those portions of the transcript formerly designated as record proper, and find no reversible error. The judgment is affirmed.

All concur.