THE STATE v. WILLIAM BLANKENSHIP and L. V. GRAY, Appellants.
—50 S. W. (2d) 1024.

Division Two, June 10, 1932.

*Sharp & Baynes* for appellants.

*Stratton Shartel*, Attorney-General, for respondent; *James K. Coolidge* of counsel.

794

FITZSIMMONS, C.—Appellants, young men about twenty years of age when tried, were charged with the crime of arson in an information filed by the Prosecuting Attorney of New Madrid County. They were found guilty and their punishment was assessed at two years in the penitentiary. From the sentence and judgment they appealed. The principal question for decision is the sufficiency of the evidence. The case presented by the State was in substance as follows: On Halloween night, October 31, 1930, there stood a box-shaped house on D. L. Fisher's farm over south of Canalou, in New Madrid County. The house was "in the corner of the fence" at a crossroads. The farm was rented from Fisher by John Ingram and W. H. Summers, and Fisher let them have the use of the unoccupied house at the crossroads to store hay and soy beans. On the night of the fire Ingram and Summers had in the house 111 bales of hay and several loads of pulled soy beans. The hay had been put in a few days before October 31, and the beans on that day. Ingram and Summers lived in a dwelling on the farm about 150 or 200 yards from the storehouse. Ingram had retired and was asleep on the night of October 31, 1930. But about 8:30 o'clock, he was awakened by the light of the burning storehouse. He aroused Summers who just had gone to bed and the two hurried to the fire. On the way they met four or five neighbors, and soon others to the number of a dozen came, some on foot and others on horseback. Appellants who lived about a mile and a half south and west of the crossroads, were among the later spectators. Ingram testified· that appellants arrived from the direction of their homes about fifteen or twenty minutes after he reached the fire. But Summers fixed their coming at thirty minutes after he and Ingram got there and after the house had fallen in. Summers overheard appellant Gray say, while watching the fire: "It made a hell of a fire didn't it?" On

cross-examination Summers admitted it did make a big fire. About eight o'clock, and before the fire, Summers went outdoors of the dwelling house and heard the voices of several persons at the crossroads. At least some of the group were mounted for he heard the movement of the horses. Among the voices he recognized that of appellant Blankenship. But Summers paid no attention to the talking at the corner for the crossroads was a favorite halting place for passing people and there were many abroad that Halloween night.

Virgil Ford, a lad about the age of appellants, testified that he rode his horse to the home of appellant Blankenship about sundown on that Halloween. Soon came Nobel McGuire on his horse, and other young men gathered. In a short time the youths went to the home of a companion named Crabtree, and from there appellants and Ford and McGuire started for a place called Charter Oak where, it was reported, a dance was to be held. Gray rode behind Ford and Blankenship behind McGuire. They passed the storage house and went about a mile and a half further to the scene of the dance. But no dance was being held and they rode back to the crossroads. There the four stopped and talked for awhile and then appellants, Blankenship and Gray, got off the horses and started south toward their homes while Ford and McGuire galloped homeward to the east.

Ford on direct examination testified that, as the four rode back toward the crossroads and as they approached the storehouse, one of the appellants said to the other: "Are we going to set it?" The answer was: "Yes." Ford did not know which of the appellants asked the question or which answered. On cross-examination Ford testified further about this statement of one of the appellants:

"Q. When you first told it you stated that one one of the boys said: 'Are you going to do it?' and the other one said: 'Yes?' A. Yes, sir.

"Q. When did you first think about saying, 'Set?' A. Well they was talking about, was we going to do it, and the other one said 'Yes.'

"Q. When you first testified a while ago you said one of the boys said, 'Are we going to set it,' how come you to do that? A. It is all the same.

"Q. It is all the same? A. Yes, sir.

"Q. When a boy says 'Are we going to do it,' it is all the same as saying, 'Are we going to set it?' A. In a way it is.

"Q. But what the boy actually said is, 'Are we going to do it?' A. Yes, sir."

Ford and McGuire had ridden about a half mile from the crossroads and had dismounted and were walking when they first observed the illumination caused by the fire. But they did not go back.

McGuire testified for the State substantially as did Ford about the assembly of the young men at Blankenship's house, their visit

to Crabtree's, the horseback ride to the dance, their return to the crossroads and their separation there after some conversation.

On direct examination McGuire testified:

"Q. When you passed this house did either one of the defendants say anything about the house? A. Only asked us to help burn it.

"Q. Tell the jury what they said. A. We was riding along and one of the boys, I don't know which one, asked me if I would help burn it, and I said, 'No.' "

But on cross-examination McGuire contradicted this testimony in this manner:

"Q. Don't you know that you never said a word about any such conversation as that when you testified here before? A. No, sir.

"Q. Isn't this what you said, that one of the boys said, 'Are we going to do that,' and one of the other boys said, 'Yes,' wasn't that what you testified to? A. (No answer.)

"Q. Come clean with it. A. I am not positive.

"Q. That is what you said, isn't it? A. I don't know.

"Q. You were sworn down here and asked what the boys said, and you testified that one of the boys said, 'Are you going to do that,' and the other boy said, 'Yes.' That is what you testified down here? A. Yes, sir.

"Q. And you didn't say anything about either of the boys asking you to burn anything, did you? A. No.

"Q. Why didn't you? A. Why didn't I?

"Q. Yes? A. If that is right, what I told you is right, and that is why I didn't.

"Q. What you said at the preliminary is right then? A. Yes, sir.

"Q. It was fresher in your mind at that time? A. Yes, sir.

Charlie James, on the night of the fire, was with a group of young men at a bridge two and a half miles from the burning building. He saw the flames and galloped off to the fire, passing Blankenship's house on the way. He did not meet either appellant along the road. He admitted on cross-examination that appellants could have taken a pathway across a field and thereby avoided the road over which he traveled. James also testified that, about the time of the preliminary examination of appellants, Gray inquired of James whether Uncle John (Ingram) had subpoenaed Nobel McGuire. James answered that he did not know and Gray then said: "There is one sure thing, two of us is going to the penitentiary and I don't know which two it is." James admitted on cross-examination that he was unfriendly to appellants.

Ed Goodman testified to a conversation had with appellants some-
[ti]me after the fire as follows:

"Q. Did you talk with either one of them? A. Yes, sir.

"Q. Which one did you talk to? A. Both of them.

"Q. Did either one of them make any statement to you about
this house? A. Well it seems in my mind they did one time. . . .
They said something about burning the house, and I said if you did
you better make a get away, and they said they didn't burn it, Billie
Blankenship did.

"Q. Was that what they said? A. At that time.

"Q. What did they say about it later? A. It seems like—
something like the first of January, no the last of January or the
first of February at court that they was talking to Mr. Ingram.

"Q. What did they say then? A. Billie said, 'I think he is
afraid to do anything.'"

This was the State's case against appellants.

On their own behalf appellants told in substance the same story
as Ford and McGuire, witnesses for the State, of the doings of the
four youths on the night of the fire down to their separation at the
crossroads. Each denied the several statements credited to one or
the other of the appellants or to both by Ford, McGuire and James.
They denied that they set fire to the house, and testified that after
the parting at the crossroads they went south toward their homes,
taking a short cut from the road across a field. Before they reached
home they saw the house afire and then they returned to the cross-
roads. Testimony as to the reputations of appellants was beside the
point. Witnesses who testified that the reputations of appellants in
the community in which they lived was good proved, on cross-
examination, to be expressing their own personal opinions. While
witnesses who testified that the reputations of appellants were bad
disclosed on cross-examination that Blankenship and Gray were criti-
cised in their community for cutting up in church and fighting at
dances. Appellants at the close of the whole case offered an instruc-
tion in the nature of a demurrer which the court overruled.

I. Appellants contend that their demurrer should have been sus-
tained for want of substantial evidence. The State on the other hand
urges that there was sufficient substantial evidence to support the
submission of the case to the jury and that the demurrer rightly was
overruled. ■ The very nature of the crime or arson of which
[appe]llants were convicted is such that it becomes necessary for the
[court] in many, if not in most, cases, to rely upon circumstantial
[eviden]ce to establish the guilt of the accused. ]State v. Santino, 186
[S.W.] 976, l. c. 977.] But what is circumstantial evidence? The

798

trial court, in an instruction to the jury in this case, gave a conventional definition in these words: Circumstantial evidence is proof of certain facts and circumstances, in certain cases, from which the jury may infer other and connected facts which usually and reasonably follow according to the common experience of mankind; and a crime may be proven by circumstantial evidence as well as by direct testimony of eyewitnesses; but the facts and circumstances in evidence should be consistent with each other and with the defendant's guilt and inconsistent with any reasonable theory of his innocence.

By that standard was there in this case any circumstantial evidence to warrant the conviction of appellants or the submission of the case to the jury? We think not. In the first place there was no testimony, direct or circumstantial that the fire was of incendiary origin. In an arson case it is not sufficient to show that a fire occurred. ■ There must be proof of circumstances from which the jury will be authorized to find the further fact that the fire was caused by the criminal agency of some one. [State v. Berkowitz (Mo.), 325 Mo. 519, 29 S. W. (2d) 150 l. c. 153.] Proof of incendiary origin is an essential element of the corpus delicti. In addition to testimony tending to prove that the fire was of incendiary origin, there must be evidence, direct or circumstantial, of the guilty agency of the accused. In this case, the presence of the two appellants with two of the State's witnesses in the neighborhood of the burned building shortly before the fire, was, by the State's own testimony, a part of the Halloween outing on which the four lads were embarked. The statements ascribed to appellants by Ford and McGuire and treated by the State as prior threats were contradicted by these witnesses on cross-examination. The fact that appellants appeared among the spectators of the fire from twenty to thirty minutes after its discovery is more consistent with innocence than with guilt. Arson cases abound with testimony that accused persons were far away when the fires occurred. If Ford and McGuire had been accused, the fact that they did not return to the fire although they saw it and had horses and although the country-side was hurrying to the crossroads would have been a circumstance of guilty agency. And there is a strong suggestion in the record that Mr. Summers was uncertain which pair of boys to prosecute. Nobel McGuire, one of the lads who was riding with appellants that Halloween night, on his direct examination for the State, testified that he met Billy Blankenship on Tuesday following the Friday on which the fire occurred. The examination then proceeds:

"Q. At that time did Billy Blankenship say anything to you about the fire? A. Yes, sir, asked me what I was going to do about it.

"Q. Is that all? A. Yes, and he said that Mr. Summers about half way accused us of it, that is all.

"Q. Said that Mr. Summers about half way accused you of it? A. Yes, sir.

"Q. What did you do? A. I went to see Mr. Summers."

The failure of Ford and McGuire to return and Summers' uncertainty whom to prosecute are mentioned solely in order to emphasize that, under the circumstances of this case, the presence of appellants sometime after the discovery of the fire was consistent with their story that they had gone nearly to their homes a mile and a half away and had come back, and that they had not caused the fire. No *innuendo* of guilt of Ford or McGuire is meant or intended. We are of opinion that the trial court erred in not sustaining the demurrer to the evidence at the close of the whole case. We are also of opinion that, owing to the absence of any substance or scintilla of evidence against appellants, they should be discharged. Accordingly it is ordered that the judgment below be reversed and the defendants discharged. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.