**STATE of Missouri, Respondent,**

v.

**Albert PAGLINO, Appellant.**

**No. 45129.**

Supreme Court of Missouri.

Division No. 2.

June 11, 1956.

Motion for Rehearing or to Transfer to Court En Banc Denied
July 9, 1956.

Charles M. Shaw and Wayne C. Smith, Jr., Clayton, for appellant.

John M. Dalton, Atty. Gen., John W. Inglish, Asst. Atty. Gen., Jefferson City, for respondent.

BARRETT, Commissioner.

A jury has found Albert Paglino guilty of a homicide in the perpetration of arson and his punishment has been fixed at life imprisonment. Sections 559.010, 559.030 RSMo 1949, V.A.M.S.

 The essence of the crime of arson is an incendiary and therefore wilful burning of property and the burden is upon the state to prove beyond a reasonable doubt

that the fire was caused by a criminal agency and the identity of the person charged as responsible for the fire; and upon the state's failure to prove these essentials the defendant is entitled as, of course to an acquittal as a matter of law. State v. Morney, 196 Mo. 43, 93 S.W. 1117; Curtis, Law of Arson, Sec. 486, p. 526; 6 C.J.S., Arson, §§ 3(a) (2), 29, pp. 721, 749; 4 Am.Jur., Secs. 42, p. 104, 44, p. 105, 55, p. 109. Except for having been so plainly established, the known, unquestionable facts are bizarre and fantastic almost beyond belief. Upon this appeal the essentially meritorious question is whether, viewed favorably to the jury's verdict, State v. Berkowitz, 325 Mo. 519, 526, 29 S.W.2d 150, 153, the plainly established facts and the circumstantial evidence, 1 Wigmore, Evidence, Secs. 26, p. 402, 149, p. 583; 20 Am.Jur., Secs. 270, p. 258, 273, p. 260, are of such probative force as to support the inference and finding of the necessary essentials of the incendiary burning of the property and the defendant's responsibility for the fire.

The appellant, Paglino, did not testify and no witness was called or testified in his behalf, hence all the evidence adduced came from the state's witnesses. About midnight, April 5, 1954, the defendant, Albert Paglino, appeared at Mr. Stark's St. Louis Tourist Court, a motel on U. S. Highway 66 (8950 Watson Road) and registered, using his correct name, as a guest. He filled out the registration card, including the make and license number of his 1950 Nash automobile. After registering, Paglino followed Mr. Stark to cabin number five. Mr. Stark turned on the light and showed him the cabin which had not been occupied by anyone for two days and there was no one in the cabin at that time. Cabin number five's double, cabin number four, was occupied by a man and a woman registered as Mr. and Mrs. Boyd "from Oklahoma." Paglino returned to the office where his car had been parked and drove it down in front of cabin number five. Mr. Stark did not examine the car closely but when he walked past it leaving and returning to the office he saw no one in the automobile other than Paglino. Incidentally, Mr. Stark never saw

Paglino again until he was brought to the motel on the afternoon of April 15th by members of the sheriff's force.

Mr. Stark returned to the office and about 12:45 o'clock turned off the master control switch for the butane gas in the cabins and went to bed. He heard no noises or disturbances and in a short time went to sleep. About an hour later, 1:45 o'clock, a man driving down Watson Road saw that the motel was on fire. He drove his car up to the office, awakened Mr. Stark and told him to call the fire department. As the man walked towards cabin number five where the fire was located he met a man and woman coming out of one of the cabins. (Again incidentally, Mr. and Mrs. Boyd, the occupants of cabin number four, are not mentioned again in this record.) The fire department arrived in about ten minutes, the back half of cabin number five, and particularly in the southeast corner, was in flames but within five minutes the fire was extinguished.

After the fire had been extinguished the charred, indistinguishable remains of a man were found on the floor between the bed and the door. Since Paglino had been assigned and presumably entered cabin number five and was not present during or after the fire, it was assumed that he was the dead man found on the floor. Consequently, on April 9, 1954, Paglino's family, his father and his brother, caused a funeral to be conducted and the charred remains to be buried in Resurrection Cemetery.

That night a nurse, a close friend of Albert's former wife, Betty, who had attended the funeral that morning, was having a drink with a girl friend in Ziegenhein's Biltmoor Lounge on South Kingshighway and was indeed startled when about midnight Albert Paglino walked into the tavern and entered a telephone booth near the bar. As Albert entered the booth she said to one of the tavern owners, "Ed, my God, we buried that man this morning." It may as well be noted at this point, parenthetically, that this was the first time since midnight on April 5th that anyone had seen or heard of Albert and, except for the subse-

quently noted bizarre narrative by his best friend McCormick, there is no explanation or accounting for his whereabouts between midnight April 5th and midnight April 9th when he walked into the tavern. When Albert came out of the phone booth the owner "went up to him and introduced myself as being Ed Bishop and I tried to get him into a conversation and I asked him to sit down and have a beer. He sat down and I gave him one glass of beer and he hadn't taken but very little of that, and I am talking to him and I asked him his name and he gave me the name of Lewis. * * * and I asked him where he lived and he said, 'Around Dresden and Eichelberger,'— I was trying to hold him until possibly the police would come in—I asked him where he worked and he told me Bettendorf's Meat Market and I said, 'Where else?' And he said, 'Clark's,' and he told me he was to meet a fellow here that works at Clarks, and I said, 'Does he manage the place,' and he said, 'Yes.' And I said, they are possibly open because I have stopped in to get gasoline on my way home." No one called the police, however, and in ten or fifteen minutes Albert left the tavern and the nurse said that he made no effort to hide or to run away.

James A. McCormick, a filling station attendant at Clark's Super Gas, 1139 North Kingshighway, was Paglino's associate if not closest friend. McCormick and his wife and Paglino and his wife were frequent social guests in one another's homes. Paglino and McCormick worked together at Clark's when Paglino was employed there in *October and November 1952* under the assumed name of Albert Lewis. McCormick was a pallbearer at the funeral on Friday morning, April 9, 1954. About midnight on the day of the funeral Paglino called McCormick on the telephone (undoubtedly the call made from the tavern) and after identifying himself said, " 'Well, this is Al again and I need help.' He said, 'I got a fictitious story,' I don't recall what words he used, but he said, 'I'm in bad trouble and I need help and I don't know if anyone will believe me.' " In ten or fifteen minutes Paglino appeared at the service station. As he walked up McCormick said, " 'I thank God I see you alive again.' " Paglino replied, " 'I'm proud to be here, but I still have a fantastic story to tell you and I don't know if it will hold,' and he said he had a good story and he was going to stick to it." McCormick closed the filling station and drove to the Warwick Hotel in downtown St. Louis where Paglino had registered on April 4, 1954, at 11:05 o'clock as Albert Lewis. They entered the hotel, Paglino got his clothes and checked out. Parenthetically again, the hotel clerk identified the registration card and the fact that the guest checked out at 3:25 a. m. April 10, 1954, but upon the trial of the case the clerk was unable to identify Paglino as the person who registered or checked out and there is no fact or circumstance in the record indicating whether, if ever, Paglino actually occupied a room or stayed in the hotel on any occasion between the hour and date of his registration and his checking out. Upon inquiry as to how he got to the service station, Paglino told McCormick that "he walked all the way from the Warwick to the place he was living on Osceola Street and back to his mother-in-law's on South Broadway and he claimed he walked from there to the station." In any event, after getting his clothes they drove to McCormick's and McCormick's wife made some coffee and they talked until four o'clock in the morning and then went to bed.

It was during this interval that Paglino told McCormick the story which McCormick, in turn, repeated to the jury. "He told me the night he left my station, this was the last time I saw him, that he was going to a radio shop, I believe out on Hampton Avenue. He told me whenever he went out there he decided to stop in the White Castle to get a cup of coffee and when he came out he saw two fellows on the corner hitch-hiking and he decided he didn't have anything else to do and he would pick them up to get them out to the City limits, which he did. And when he got to the City limits, he said this was as far as he could go and one fellow pulled out a gun, a '45'; and forced him down the road and he was driving all night and the next

day he got down some place in Oklahoma and he said there was one fellow at the station they stopped at which would verify he was there. They had to open up the safe to get change for a five dollar bill. And he said they went to Amarillo, Texas, I believe, and he said these fellows forced him out of the car. I asked him, 'Did he get anything out of the car,' and he said, 'No, the only thing he got was the suitcase, and I did not see a wallet or anything else.' He claimed he hitch-hiked all the way back and in the meantime he went to the police in Amarillo and they thought he was faking and needed a place to sleep for the night and he claimed he hitch-hiked the rest of the way to St. Louis. * * * Q. Did he say anything to you about the funeral of Albert Paglino? A. He said he learned that, he read it in a paper in Springfield, Missouri. I asked him, me and my wife both, why he didn't go to the police and he said he was afraid to go to the police in St. Louis that they would have him charged with murder in the first degree, and he said he was going to go when he notified his lawyer, but he would like to see his wife first."

It is just as well to briefly digress at this point and particularly consider the implications of this phase of McCormick's testimony. It is indeed a fantastic if not dead-pan narrative. And yet, except for its own inherent improbability, there is no denial of it or proof of its falsity in whole or in part. As indicated in connection with his registering and checking out of the War-wick Hotel, there is no fact or circumstance in the record accounting for Paglino's movements or whereabouts from midnight on April 5th to midnight on April 9th when he walked into the tavern on Kingshigh-way. If the state considered the story an evasion indicative of consciousness of guilt, for all that appears upon this record, he could have made the round trip to Amarillo, Texas.

In any event, Paglino spent the remainder of the night or the remainder of the morning of the 10th in the McCormick's home. After a late breakfast Paglino and McCormick "walked over to get a paper," went to a bakery, and again returned to McCormick's where Paglino stayed, according to McCormick, until Tuesday, April 13, 1954. And these three days are the sole accounting for his movements or whereabouts from midnight April 5th to the hour of his arrest about 11 o'clock on the night of April 15th as he walked towards his Nash automobile opposite his father's home in the 5200 block of Vernon Avenue.

It does not appear when or how the sheriff's office learned that Paglino was alive. It only appears that on Thursday, April 15, 1954, his Nash automobile was parked on the street in the 5200 block of Vernon Avenue, near his father's home, and that the sheriff's office had a "stake out" on the car and arrested Paglino as he approached the automobile about eleven o'clock that night. It was not until the following day, April 16, 1954, that a fireman and a police officer in sifting the ashes of the partially burned cabin found a charred wallet or bill-fold, some pieces of brown cloth and some pieces of cloth from a man's undershirt. In the wallet there was a social security card bearing the name of Willie Burchett and a picture of a boy and a girl. Willie's sister, from Ecorse, Michigan, identified the photographs as pictures of her son and niece. She had not seen Willie for more than six years. The last communication she had had from him was a postcard about six months prior to the trial and she did not remember where the card was post-marked. It had been more than a year and a half since she had had a letter from Willie and that letter, enclosing a police photograph, came from a jail in Wichita, Kansas. No one, so far as appears, ever saw Willie in St. Louis or knew that he was there and it does not appear that he ever saw or was acquainted with Paglino or that Paglino ever saw Willie. On April 6, 1954, a pathologist, Dr. Pfaff, examined the charred body found on the cabin floor but made no effort to identify the body or to perform an autopsy. He did take a sample of blood from the heart vessels and an analysis of the blood revealed the presence of "Point 41 (.41) grams per cent ethel alcohol content" and "a carbon monoxide

saturation of 80.2 grams centimeter." It was the doctor's opinion that the dead man was "in a state of acute alcoholic intoxication," that he had consumed enough alcohol to have caused death. On April 16, 1954, the body was exhumed and an autopsy was performed. From the 80.2 per cent carbon monoxide saturation found in the blood on the sixth of April and the particles of carbon found in the trachea on the sixteenth it was the doctor's opinion that the man's death "was caused by the extreme heat of the fire and carbon monoxide which is in attendant with the burning and the flames." And so it was established that Willie Burchett was alive prior to the fire and that his death resulted from the fire.

■■ In arson, as in many other crimes, motive, if there be one, is a factor for the jury's consideration, but "Presence of motive, without other evidence, is insufficient, just as absence of motive is not sufficient to set aside a conviction otherwise sustained by positive evidence of guilt." State v. Jackson, Mo., 267 S.W. 855, 857; State v. Cox, 264 Mo. 408, 175 S.W. 50. In this case the state's theory of Paglino's motive for using the assumed name of Lewis and for burning the motel and a human being was to create the illusion of his own death and disappearance. The reason for his urgent desire to establish his ostensible death and disappearance was to escape the harassment of his wife's claim for alimony and the fact that his last employer, Bettendorf's had been garnished in January 1954.

It is necessary to consider these two matters: first, briefly, the use of the assumed name of Lewis. On April 4, 1954, he registered at the Warwick Hotel using the name "Albert Lewis." In January and February 1954 he was employed at Bettendorf's as a butcher. He joined the butchers' union in February 1953 and was working at Bettendorf's under the name of Albert Paglino. He used his correct name in registering at the motel. At Clark's Super Gas he was employed as Albert Lewis, but that was in 1952. When arrested on April 15, 1954, he told one of the arresting officers that he used the name of Lewis to avoid his wife's garnishment proceedings. A handwriting expert testified that the signatures, "Paglino," on the motel register, on the union membership application blank, on canceled checks at Bettendorf's and on the police register on April 15 and the signature "Lewis" on the Warwick Hotel register and on canceled checks from Clark's Super Gas were all written by the same person, obviously, the appellant, Paglino.

In connection with the use of the assumed name is the motive of avoiding his wife's attempt at collecting alimony. A lawyer testified that he obtained a divorce for Paglino's wife, Betty Ann Paglino, in 1950. By January 1954 there was $3,000 to $4,000 alimony due and that month the lawyer caused Paglino's employer, Bettendorf's, to be garnished. Paglino went to the lawyer's office and they talked about the alimony but reached no agreement and Albert departed.

Despite the use of the assumed name and the desire to create the appearance of death, all to avoid the alimony and the garnishment proceedings, on the very night of the funeral he appears at a tavern on Kingshighway, and, while he tells the tavern keeper that his name is Lewis, he is seen by his wife's friend, the nurse, he gives the correct name of his last and of his former employers and he does not appear to be hiding. He calls and meets his friend McCormick and the following morning, Saturday, April 10, 1954, after Paglino and McCormick return from their errands, Paglino told McCormick that he was going to the police after he notified his lawyer "but he would like to see his wife first." Paglino "wanted to know if we knew any place of his wife being and we thought she would be at her mother's on South Broadway and we contacted her mother which was on South Broadway and her mother had told us she had gone to spend a couple of days with friends in Illinois." The McCormicks did not know the way to the place Betty was staying in Illinois but Paglino drew a map for them and McCormick and his wife and two children drove to Illinois, found Betty and brought her

back to their home. Paglino and his wife, or former wife, stayed with the McCormicks that night, Saturday, and on the following days and nights, Sunday and Monday, and left together in the 1950 Nash automobile on their way, so they said, to see Paglino's lawyer.

Before considering the essential merits of the appeal, there is one other preliminary matter to be noted and that is the 1950 Nash automobile. It will be recalled that after registering at the motel Paglino drove the automobile from in front of the office and parked it near cabin number five. After the fire the automobile was near the cabin but had been rolled back a short distance and a deputy sheriff had it "towed in to Brigg's Service Station in Sappington." Except as to be noted immediately, the automobile is not again accounted for officially, searched, or seen again until the sheriff's office has a "stake out" on it as it is parked on Vernon Avenue on April 15th near his father's home. It does not appear when, how or who got the automobile after the officers had it towed to the service station in the early morning hours of April 6th. McCormick said that the car got to his house "I believe a Sunday afternoon or a Monday. Betty asked me to go down, she could not get the car started and asked me, which I did, and she drove the car from their house to mine. * * * South Broadway, her mother's house," in the 7400 block. The court excluded the fact from the jury's consideration but when Paglino was arrested on the 15th there was a partially empty gasoline can in the trunk of the Nash automobile.

■ If in these circumstances the motive has become extremely confusing, if not muddled, Curtis, Arson, Sec. 340, p. 362, it is nevertheless certain that Paglino had the opportunity to have set the cabin on fire. He registered at the motel and was there about midnight and so he had the opportunity to have set cabin number five, or Willie Burchett, on fire. But, as it is with the other essentials of arson, the presence of motive and proof of opportunity are not sufficient to sustain a conviction.

"This was some evidence of a motive upon the part of the defendant to do the criminal act. There was also some evidence that, 'if' defendant had gone with his shoes off, he might have been able to go from his room on the third floor of the hotel down the stairway to the second floor and out through the sample room thereon located, and from there down the incline to the alley, in the rear of the hotel, without being detected by the night clerk of the hotel. This, at most, would only show a possible opportunity the defendant had to commit the crime without being detected. But is the mere fact that defendant had a motive for causing the fire, and a possible opportunity to have carried out such a motive, a sufficient showing to warrant the jury in finding that, in fact, he did carry out such motive and cause said fire? We think that such a showing is not sufficient. * * * It would be a rather unjust and dangerous rule that held that the mere showing of motive and opportunity would overcome the presumption of defendant's innocence and establish, beyond a reasonable doubt, his participation in the criminal act." State v. Ruckman, 253 Mo. 487, 499, 161 S.W. 705, 707–708. In the Ruckman case the defendant owned a mortgaged pool hall which was far from being a financial success. He had tried, unsuccessfully, to sell it and it was over-insured. A few days before the fire his landlady's son had split some kindling for the defendant and stacked it in the warehouse. After the fire, discovered about 3 o'clock in the morning, had been extinguished containers of coal oil were found in the pool room and kindling was stacked around the legs of the pool tables. While the court conceded that from motive, opportunity and these circumstances "the finger of suspicion might point to the defendant," the court, nevertheless, held that the evidence was insufficient to sustain a conviction of arson.

As previously stated, Paglino was in the motel at midnight and he was not seen or heard of again until midnight of April 9, 1954. According to his story to McCormick it was on that date in Springfield that he first learned of the funeral but it does

not appear that he thereafter reported the fact of his being alive to the officers. It is possible that this phase of the record is sufficient to support the inference of flight but if it is not there is other evidence to support the inference of flight before trial. There is no showing that Paglino was out on bond or that he escaped jail, annotation 25 A.L.R. 886, 897, but a deputy circuit clerk testified that his case was set for trial on October 18, 1954, and that he did not appear on that date and that a capias was issued for his arrest. It does not appear how he got there or why he was in jail in El Centro, California, or why the sheriff and a deputy were there or by what authority they returned him to Missouri, nevertheless, Sheriff Mosley and a deputy saw him in jail in El Centro in February 1955 and brought him back to St. Louis County where he was tried in June 1955. So, we have present the two factors noted, motive and opportunity, and flight but, again, these factors alone are not sufficient to establish or prove the essence of the offense of arson, the incendiary origin of the fire. "Although a verdict based on circumstantial evidence may, in a proper case, be sustained, one cannot be convicted of the crime of arson merely upon a suspicion that he has committed the offense. * * * Thus, one cannot be convicted of arson merely because the prosecution shows a motive or an opportunity for committing the crime, or that his footprints or tracking by bloodhounds indicates that he may have been present at the time of the fire. Nor can he be found guilty merely because of his flight after the fire, or on account of other suspicious circumstances indicating a consciousness of guilt. * * * Moreover, the combination of two or more of such circumstances may not afford adequate proof of guilt." Curtis, Arson, Sec. 500, pp. 547–549; State v. Jones, 106 Mo. 302, 17 S.W. 366; State v. Ruckman, supra.

■■ As stated in the beginning, in its essence the crime of arson is the incendiary burning of property and the essentially meritorious and determinative question is whether the evidence is sufficient to support that essential finding. "In the first place there was no testimony, direct or circumstantial, that the fire was of incendiary origin. In an arson case it is not sufficient to show that a fire occurred. There must be proof of circumstances from which the jury will be authorized to find the further fact that the fire was caused by the criminal agency of some one. * * *. Proof of incendiary origin is an essential element of the corpus delicti. In addition to testimony tending to prove that the fire was of incendiary origin, there must be evidence, direct or circumstantial, of the guilty agency of the accused." State v. Blankenship and Gray, 330 Mo. 792, 798, 50 S.W.2d 1024, 1026. Where, as here, a homicide is charged to have been committed in the perpetration of arson the corpus delicti is not proved by a showing only of a fire and a death resulting from the fire because on such showing alone the fact of the criminal agency causing the death is not made to appear; "there must be evidence tending to prove that the fire which caused the death of the person charged to have been murdered was of incendiary origin." State v. Meadows, 330 Mo. 1020, 1025–1026, 51 S.W.2d 1033, 1036, one of the Buckingham Hotel Annex cases. The rule does not mean that there must be proof, necessarily, that some highly combustible material was employed; although that is the usual method employed and of which there is usually some evidence. The rule can only mean that there must be some evidence, direct or circumstantial, that the person charged intentionally started or set the property on fire. State v. Freyer, 330 Mo. 62, 48 S.W. 2d 894. Nevertheless, when there is no proof other than the mere fact of an unexplained fire "the presumption is that the fire was caused by an accident or natural causes, or, at least, that it was not of criminal origin, * * *." 6 C.J.S., Arson, § 29(b), p. 750; 4 Am.Jur., Sec. 44, p. 105; State v. Jones, 106 Mo., loc. cit. 312–313, 17 S.W., loc. cit. 369. And, "It matters not that there was no evidence tending to show that some other person than the defendant committed the crime." State v. Morney, 196 Mo. loc. cit. 50, 93 S.W. loc. cit. 1119.

In State v. Ruckman, supra, the presence of containers of coal oil and kindling piled around the legs of the pool tables plainly indicated that the fire was of incendiary origin. In State v. Jackson, Mo., 267 S.W. 855, a jilted lover was found guilty of arson when the frame residence of his paramour, next door to the fire station, partially burned. But there the brush end of a broom was found inserted between the weatherboarding and the lathing and the flames followed upward from the blazing broom. In other cases articles of furniture or a stack of merchandise have been removed from a house or a place of business, there was an explosion and cans or buckets containing gasoline or some highly inflammable substance were found. State v. Lawrence, Mo., 71 S.W.2d 740; State v. Berkowitz, 325 Mo. 519, 29 S.W.2d 150. In this case there was no noise and no evidence of an explosion. The state sought to show that there were shooting flames and from the manner in which the fire burned that it was or must have been of incendiary origin. But the facts were that the motel was a wooden structure, seventeen years old, with tar paper roofing and tar paper siding. The young man who first saw the fire said that he came over a hill and "all of a sudden I seen a fire." In describing in detail what he first saw the young man said, "I see it all at once. I didn't know if it was an explosion or what. It caught my eye all at once, and it was burning and had a pretty good size flame when I seen it." The firemen arrived about two o'clock. The cabin was then in flames, mostly in the back half and particularly in the southeast corner and "flames were shooting through the roof." The fire, however, was extinguished in five or ten minutes. The fire marshal was repeatedly examined in an effort to inferentially establish the incendiary origin of the fire but he said that the structure itself, with the tar paper roof and siding, was highly inflammable. He returned after daylight and again examined the cabin in an effort to determine whether the fire was caused by incendiary means but he said, "We couldn't determine whether it was arson or not," there was nothing to indicate arson. There were no traces of gasoline and no indication from the fire itself of its having originated from gasoline. He said, "No, you wouldn't be able to tell if gasoline was in there or not, as old as this building was." (In this connection, the fire marshal and the firemen were not professional firemen, they were volunteers and comprised the volunteer fire department of the Village of Afton.) The evidence as to the nature of the fire, the manner in which it burned and all the circumstances do not support the necessary inference that the fire was intentionally set or started or that any human agency was connected with the burning. In short, "There is good reason for saying the proof of the corpus delicti failed to measure up to the standards set by law." State v. Freyer, 330 Mo. loc. cit. 71-72, 48 S.W.2d loc. cit. 898; State v. Jones, supra; State v. Adkins, Mo., 222 S.W. 431; State v. Blankenship and Gray, supra; State v. Morney, supra. In this case the evidence clearly supports and establishes the convincing and suspicious factors of opportunity and flight. In State v. Ruckman, supra, there was motive, possible opportunity and an incendiary fire and if the evidence in that case was not sufficient to sustain a conviction, a fortiori, the circumstantial evidence in this case is not sufficient to support the inference of an incendiary burning by the appellant. And, therefore, of necessity the judgment is reversed and the cause remanded. State v. Ruckman, supra.

BOHLING and STOCKARD, CC., concur

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.