**STATE of Missouri, Respondent,**

v.

**Russell Kelsey PAILLOU, Jr., Appellant.**

No. 49856.

Supreme Court of Missouri,

Division No. 2.

March 9, 1959.

Carl E. Starkloff, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Donal D. Guffey, Asst. Atty. Gen., for respondent.

JAMES W. BROADDUS, Special Judge.

On October 7, 1957, the Prosecuting Attorney of Texas County filed an information wherein it was charged that on August 26, 1957, the defendant, Russell Kelsey Paillou, Jr., did then and there willfully, unlawfully, maliciously and feloniously, set fire to and burn a house located in Licking, Missouri, said house being the property of Jennie Lanier. At a trial on October 23, 1957, defendant was found guilty as charged, and his punishment assessed at imprisonment in the penitentiary for a term of two years.

Defendant's chief contention is that the trial court erred in overruling his motion for a directed verdict of acquittal because (a) there was no evidence from which it could be found that the fire was of an

incendiary origin and (b) there was no evidence showing that defendant was the criminal agency which caused the fire. Because of the fact that this is the important question involved in this appeal, it becomes necessary to set forth the evidence somewhat in detail.

It was admitted that the house in which the fire took place was owned by Jennie Lanier. It was a "small" house, with two bedrooms, a living room, and a combination kitchen and dining room. It was located, according to the witnesses, "behind Dr. Randall's house." Dr. Randall's house is located on the west side of Highway 63. Just south of the Randall house is a Baptist Church, which also fronts on Highway 63. In between the church and the Randall house is a narrow roadway, referred to by the witnesses as an "alley."

On the day of the fire, August 26, 1957, Wilma Paillou was granted a decree of divorce from defendant at Houston. Returning to Licking she went to the home of her mother, Mrs. Carney. Mrs. Carney's home is located on the east side of Highway 63, "just across the highway from the Baptist Church."

The first witness called by the State was Fred Loyd, City Marshal of Licking and a deputy sheriff of Texas County. He testified that he had known the defendant for about ten years; that he first saw the defendant on the date of the fire between 7:15 and 7:30 p. m., when defendant came across the highway going to the house of his former mother-in-law, Mrs. Carney; that he saw the defendant talking to somebody outside of the door of Mrs. Carney's house. At that time the witness was in his car which was parked on the east side of Highway 63 and near the Carney house. Later on he drove to the other end of town, turned around, and then parked his car on the other side of the highway "in front of Dr. Randall's property." Soon thereafter he saw defendant drive up the "alley," stop his car, get out, and go up to "Dr. Randall's house." Then the "fire alarm blew" and

the witness drove to the telephone office in order to ascertain the location of the fire. Being told that it was the Lanier house that was on fire he hurried to the burning house. He saw "smoke coming right up over the top of the house, and "Bud (defendant) was trying to get into this—I guess you'd call it the front door. It was the kitchen door, but it was the door that faces the alley * * * he was just kinda bent over and had ahold of the screen and trying to pull it open. The smoke was just rushing out that door." Mr. Loyd did not assist in the fighting of the fire, saying his duties were to take care of the traffic. He returned to the house after the fire had been extinguished in company with the Sheriff. This was about midnight. The witness gave testimony concerning the contents of the house, the specific location of the fire, and the location of various rooms of the house. He testified that he did not observe fire damage in any of the rooms, except the northwest room; that the damage in the other rooms was from smoke and water, "mostly water."

Charlie Crum testified that he lived in back—"right west of the Baptist Church;" that the Lanier house is about 120 feet north of his house; that he was at home on the night of the fire; that he first saw the defendant about 6:30 p. m.; that the defendant went in and out of the house on several occasions carrying a box or basket which he put in his car; that defendant's children, a boy and a girl, were with him at that time; that soon thereafter "the children started away and he called to the little girl and said, "Dorothy tell your mother to come down, I'd like to talk to her a few minutes and Dorothy said 'Okay' and they went on;" that later on the witness saw the lights in the Lanier house go out and "I had laid down on the bed by that time and when I heard his car motor start, why I got up and went to see what he was going to do, or what he did so, and he just got his car turned around and was ready to take out when I saw him, and he started out in a hurry and he ran

over some old stave bolts that was there in the yard and he made an awful racket with his car, and I thought he'd tore it up, maybe. So he ran up as far as Dr. Randall's and stopped;" that "before he (defendant) got started back down from Dr. Randall's, why I saw the smoke and fire coming up over the comb of the house."

Mrs. Alta Randall testified that after she and Dr. Randall had had their evening meal she was sitting on their front porch; that she saw defendant go up and down the alley three or more times and that he had his children with him; that at about 8:30 and "when dark had come on" she was sitting by her window "doing my cross-word puzzle;" that defendant came up to the window and said, "Mrs. Randall, will you call the Fire Department? Q. Did he say anything else to you, Mrs. Randall? A. Well, he said, 'I've set that damned house on fire' but he didn't say—Q. That's all. A.—he did it no purpose." Thereupon defendant's counsel said: "Just a minute. What was the rest of that answer? I'd like to have her repeat her answer." The request being granted, the witness then said: "Well, he didn't tell me he did it on purpose at all. And I didn't even answer him. I ran around and—the table a time or two and called the Fire Department."

Wilma Paillou, the former wife of defendant, testified as to the location of certain furniture in the house which she had rented from Mrs. Lanier; that in the northwest room "there was a bed against the west wall, and a cedar chest at the foot of it; that on the north wall there was a shelf with a set of encyclopedia and under that there was a child's table, two stools and a toy box; that in the southeast corner of the room was a chest of drawers;" that she saw her former husband about 6:00 p. m. on August 26, 1957, at her mother's house, which is across the street from the Randall house; that he asked her to go down to the house with him; that she told him he didn't have any business down there and thought he should go back to St. Louis and "he told me he wanted me to go with him and he said he was going to kill himself. I asked him not to. He said that he—I would hear a big racket and it would take care of himself, the car and the house." On cross-examination she testified that defendant had personal belongings in the house.

Roy Williams, Arthur Johnson and Virgil Pruitt testified that they were members of the volunteer fire department of Licking; that they went to the fire and put it out; that when they arrived they observed that the fire "was in the northwest bedroom;" that this bedroom was the worst burned of any room in the house.

The defendant testified in his own behalf as follows: That he visited the house in question on the evening of August 26, 1957, and was there on three or four occasions; that he last visited the house at approximately 8 o'clock in the evening; that he had personal belongings in the house which he had gone to collect; that he turned on the lights and then decided that he would wait until morning to leave, so he turned off the lights and went to bed; that he did not completely undress, but took his shirt off; that he went to sleep and "the next thing that happened, I woke up choking—almost choked down, and I proceeded to go out of a window that was right alongside of the bed I was sleeping in;" that it was the east window of the northeast bedroom; that he jumped in his car to go to turn in a fire alarm; that he had no telephone in the house; that when he was "driving up the alley adjacent to the building I saw that the light was on in Mrs. Randall's house and she was sitting by the window;" that he asked Mrs. Randall if she would turn in the fire alarm; that he went back to the burning house for the purpose of attempting "to get some of the belongings or the contents out;" that he did not get into the house; that the fire department arrived a little later; that he assisted the firemen in that he attempted to help unloosen a couple of bottles of gas cylinders which were alongside of the

building; that he still had his shirt off. He further testified that he did not believe that he had made the statements testified to by Wilma Paillou; that he did not know how the fire started. Upon cross-examination in answer to a question as to whether he had ever lived in the house, he stated that he did not know how to answer because he traveled for a living and came home very seldom, but that his personal belongings were there, his children lived there and he resided there when he was in Licking; that he carried out part of his belongings on two or three occasions that evening, but that "some of my belongings are still in the house;" that he "said something else" to Mrs. Randall in addition to asking her to call the Fire Department, "but I'm not exactly sure what it was." Upon re-direct examination the defendant testified that he smoked cigarettes.

Len Wilson testified in rebuttal for the State: That he was Sheriff of Texas County; that he went to the Paillou house close to midnight on the day of the fire; that he observed the bed in the northeast bedroom; that "the bed was smooth and the bed cover was laid back just like anyone would make a bed. There was no wrinkles in it." Upon cross-examination the Sheriff said there had not been much fire in the northeast bedroom, but that there was water in there and the bed was wet; that very little of the furniture had been burned, but that the walls had been burned some; that the firemen had been in there. The witness further testified that since the fire occurred a State Fire Inspector by the name of Truman had inspected the burned premises in his official capacity.

As stated by this court in State v. Paglino, Mo., 291 S.W.2d 850, 851: "The essence of the crime of arson is an incendiary and therefore wilful burning of property * * *." And in the case of State v. Blankenship, 330 Mo. 792, 50 S.W.2d 1024, 1026, this language appears: "In an arson case, it is not sufficient to show that a fire occurred. There must be proof of circumstances from which the jury will be authorized to find the further fact that the fire was caused by the criminal agency of some one. State v. Berkowitz, 325 Mo. 519, 29 S.W.2d 150 [153]. Proof of incendiary origin is an essential element of the corpus delicti. In addition to testimony tending to prove that the fire was of incendiary origin, there must be evidence, direct or circumstantial, of the guilty agency of the accused." Turning again to the Paglino case, supra [291 S.W.2d 857], we find the following: "There must be some evidence, direct or circumstantial, that the person charged intentionally started or set the property on fire. * * * Nevertheless, when there is no proof other than the mere fact of an unexplained fire 'the presumption is that the fire was caused by an accident or natural causes, or, at least, that it was not of criminal origin * * *.' " As was said in State v. Jones, 106 Mo. 302, 312, 17 S.W. 366, 369, where the property destroyed was a dwelling house, "the 'corpus delicti' in arson is not merely the burning of the house, but that it was burned by the willful act of some person, criminally responsible for his acts, and not by natural or accidental causes." The case is cited with approval and substantially the same language used in State v. Cox, 264 Mo. 408, 412, 175 S.W. 50, 51.

Where is there any evidence that defendant intentionally set the house on fire? Certainly his remarks to Mrs. Randall do not show it. She put the correct construction upon his statement when she said, "he didn't say he did it on purpose." And the State's brief says: "We wish to note that the statement of the defendant made to Alta Randall ('I have set that damn house on fire') in and of itself does not rise to the dignity of a confession because it does not accomplish an essential element of the criminal offense, i. e., intent. Therefore, at most, it would be characterized, we submit, as an admission against interest." When defendant made

the statement, coupled with the request to "call the Fire Department," he knew that he had been the last person in the house and thus realized that he must have caused the fire. His statement indicates to us that he was provoked at himself to think that by carelessness or negligence on his part the fire had taken place.

■ As to the statement made by defendant to his former wife that she "would hear a big racket and it would take care of himself, and the car and the house," the State's brief says it "is certainly not a confession, and should not be characterized as an admission for the reason that it was made prior to the time of the alleged offense. It is merely a statement or threat made prior to the alleged criminal offense." It is hornbook law that one cannot be convicted of a crime for merely harboring a criminal purpose. In the Jones case, supra [17 S.W. 367], the defendant made the statements: "I will have my revenge out of Robertson, if I have to burn his barn down" and "it (the barn) might get burnt up * * * and if we saw a light or fire * * * that we would know what it meant." And yet this court held that the State had not made a submissible case.

■ Let us now consider the circumstances involved in the instant case. "To convict on circumstantial evidence alone, the circumstances must be consistent with each other and with the hypothesis of the defendant's guilt, and inconsistent with every other reasonable hypothesis, including that of innocence—they must be irreconcilable with the innocence of the accused." State v. Freyer, 330 Mo. 62, 48 S.W.2d 894, 899. Here we see the defendant, according to the State's witness Crum, leaving the house "in a hurry, running over some old stave bolts" and making "an awful racket with his car." This to us means but one thing—he was surprised that the fire had occurred. He "started to go downtown to turn in a fire alarm" and seeing a light in the Randall house and Mrs. Randall sitting by the window he stopped and asked her to "call the Fire Department." This was not the act of an arsonist. He then returned at once to the burning house. Both Crum and the City Marshal, Loyd, say that. As said in the Blankenship case, supra [330 Mo. 792, 50 S.W.2d 1026]: "The fact that appellants appeared among the spectators of the fire from 20 to 30 minutes after its discovery is more consistent with innocence than with guilt." Loyd saw the defendant at the front door of the house "ahold of the screen and trying to pull it open." This corroborates defendant's testimony that he went back to the house "to get some of the belongings or contents out." Defendant says he assisted the firemen. This was not disputed. All of the witnesses say the fire started in the northwest bedroom. This was the "children's bedroom," containing their toys, books and clothes. Everything points to the fact that defendant was fond of his children. It is inconceivable that he would seek to destroy their belongings. There are these other factors which are also inconsistent "with the hypothesis of the defendant's guilt": (1) This house did not belong to defendant's ex-wife. It belonged to Mrs. Lanier. There is not a particle of evidence that defendant had any ill feeling toward Mrs. Lanier. He may have had toward his former wife, but "the presence of motive and proof of opportunity are not sufficient to sustain a conviction." State v. Paglino, supra [291 S.W.2d 856]. (2) Some of defendant's "belongings" were in the house. (3) There was no indication that any arrangements had been made for an arson, no coal oil or smell of coal oil was discovered, no explosion took place. (4) After the fire occurred a State Fire Inspector inspected the premises. The fact that he was not called as a witness is a strong indication that he found nothing to indicate that the fire was of incendiary origin.

We are of the opinion that the trial court erred in not sustaining defendant's motion

for a directed verdict offered at the close of the whole case. The judgment is reversed and the defendant discharged.

STORCKMAN, P. J., and EAGER, J., concur.