**STATE of Missouri, Respondent,**

v.

**Glen Calvin BUNTON, Appellant.**

**No. 54632.**

Supreme Court of Missouri,
Division No. 1.

May 11, 1970.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Jay White, Rolla, for appellant.

HOUSER, Commissioner.

Glen Calvin Bunton, convicted of arson and committed to the department of corrections for three years, has appealed, contending that the court should have directed a verdict of acquittal on the ground that the State failed to prove that the fire was of incendiary origin and failed to prove the criminal agency of defendant.

Stated in the light most favorable to the State, the evidence shows the following: A large, old, unoccupied building known as "The Grotto," located in the country southwest of Newburg in Phelps County, was destroyed by fire on September 21, 1968. That afternoon defendant Bunton and the Forester boys, Clarence and Jackie, decided to go "to Vernelle's" to get some beer. They left Newburg in a Buick owned by Forester's wife. Defendant Bunton, who was driving, stopped the car at a point on the road one-fourth of a mile or less from the Grotto and told the others that he was going to get out and that he would stay there until they went for beer; until they "got back." The Forester boys went on to Vernelle's, where they purchased two 6-packs of beer. Upon returning to the place where Bunton had left them they could not find him. Jackie, the driver, parked the car near a low water bridge and asked Clarence to go back and look for Bunton. While Jackie was waiting there a fisherman stopped, got out his tackle and went down the creek. Clarence, gone 10 or 15 minutes, came back without Bunton. Jackie drove back to the Grotto looking for Bunton and then crossed "the tracks" and drove 500 feet or so "up the holler" looking for him. He stopped and blew his horn, without locating him. On the way back, while passing the Grotto, Jackie "looked over" and saw that the Grotto was on fire. It looked like "the whole inside" was ablaze. He drove to the bridge and asked the fisherman if he had seen anybody leave the building. The fisherman said he had seen somebody come

from the direction of the building. Jackie drove on to Newburg, called the fire department and highway patrol, and was parked in front of a restaurant waiting for the troopers to arrive when Bunton came down the street and got in the car with him. The two got into an argument over Jackie's billfold. It seems that when Bunton got out of the car near the Grotto he insisted that Jackie leave his billfold with him, which Jackie did. When Bunton rejoined Jackie in Newburg Bunton told Jackie that he left the billfold "on the steps of the building there." Jackie took this to mean the building that burned. Later in the afternoon the two men were arrested and jailed for drinking on the street. Bunton then changed his story and said the billfold was under the seat of the automobile. The two men "had a ruckus" in the jail and at last Bunton handed the billfold over to Jackie in the jail.

At the time the fire broke out the building was unoccupied, unattended, and securely locked. Some repair and painting had been done on the inside recently. A half of a can of stain had been left in the building. The fire appeared to have originated on the inside of the main structure between the inner wall and the porch. A highway patrol trooper investigated the premises while the debris was still burning and again later. He found no "fuel cans or anything of that sort." The wiring had been checked and repaired at the instance of the owner and it was in good condition. There was no gas or any kind of heating in the building. The hot water system had not been used for years. There was one gas stove, which was disconnected. There was no oil or other combustible fuel in the building. The large hall had electricity connected but the rest of the house was not connected to electric power. Bunton had no interest in the building and had not been sent there to work as an employee of the owner.

The fisherman, a Methodist minister, drove up to the Grotto, turned around and parked at the low water bridge behind the Forester car. He saw no person and saw no car at the Grotto but did observe a man in the car behind which he parked. While he was putting on his fishing waders a second man came down from the direction of the Grotto, got in the Forester car, and the two men drove away in the direction of Newburg, turned around at the junction, came back across the bridge and moved in the direction of the Grotto and out of sight. Before he completed making preparations for fishing the fisherman heard several sounds of breaking glass "like several windows being broken in succession." The sound seemed to be coming directly from the Grotto. The fisherman "yelled in the direction of the Grotto" and then continued making preparations to fish. About one or two minutes after he heard the sounds of breaking glass the fisherman saw a man, identified later as Bunton, "coming from the direction of the Grotto" toward the fisherman. Bunton proceeded directly down the road to a point about a third of the way from the Grotto to the fisherman's car, then crossed the fence and made a circle around the area where the fisherman was. When Bunton approached the river he came back out on the road, crossed the bridge and proceeded in the direction of Newburg. Approximately 15 minutes later the car which had previously been parked in front of the fisherman's car returned from the direction of the Grotto. One of the men got out and spoke to the fisherman, saying, "Did you know that building is on fire?" and asked where he could go to report the fire. The fisherman suggested that he go into Newburg. The man asked if anyone had passed by there. The fisherman answered in the affirmative. The man with whom he had been conversing got back in his car and drove off in the direction of Newburg. The fisherman did not go up to the Grotto building before the fire, he did not see anyone setting a fire and did not see anyone "around the building."

Defendant did not take the stand and offered no evidence.

In order to make a submissible case on a charge of arson the State is obligated to prove that a building caught on fire; that the fire was incendiary in nature, that is, that the burning was the willful act of some person criminally responsible for his acts and not by natural or accidental means, and the defendant's agency in the performance of the act. State v. Jones, 106 Mo. 302, 17 S.W. 366; State v. Paglino, Mo.Sup., 291 S.W.2d 850; State v. Paillou, Mo.Sup., 321 S.W.2d 445. It is not sufficient to show that a fire occurred. When there is no proof other than the mere fact of an unexplained fire "the presumption is that the fire was caused by an accident or natural causes, or, at least, that it was not of criminal origin." 6 C.J.S. Arson § 29(b), p. 750; State v. Jones, supra; State v. Paglino, supra. Furthermore, "[t]here must be evidence, direct or circumstantial, of the guilty agency of the accused." State v. Blankenship, 330 Mo. 792, 50 S.W.2d 1024, 1026.

There was no direct evidence that the fire was incendiary in nature; that it was willfully and intentionally set for the purpose of burning the building, or that appellant was the doer of the deed. If this conviction is to be affirmed it must be on the basis of circumstantial evidence. To make a circumstantial case against this appellant the State was obligated to prove a set of circumstances consistent with each other, consistent with a hypothesis that this appellant was guilty and at the same time inconsistent with a hypothesis that he is innocent and with every other rational hypothesis except that of guilt. State v. Morney, 196 Mo. 43, 93 S.W. 1117[1]. The circumstances must be irreconcilable with the innocence of the accused. State v. Freyer, 330 Mo. 62, 48 S.W.2d 894, 899; State v. Paillou, supra, 321 S.W.2d, l.c. 449.

Tested by that standard there was not sufficient circumstantial evidence to justify submission of the case to the jury or conviction of appellant. There was no circumstantial evidence that the fire was of incendiary origin. As in State v. Freyer, supra, 48 S.W.2d, l.c. 898, the record is "absolutely devoid of testimony connecting any human agency with the burning; nothing was shown to have been left on the spot by the perpetrator; there was no indication any arrangements had been made for an arson, no coal oil or smell of coal oil was discovered, and no footprints were found" about the building. No inflammable substances, oil-soaked rags, combustible chemicals, petroleum products, half-burnt matches or other means or instrumentalities of incendiarism were found on the premises. Neither the nature of the fire, nor the manner in which the building burned, nor other circumstances surrounding the burning gave any clue indicating that the fire was intentionally set or started by a human being. There was no circumstantial evidence of the guilty agency of appellant. There is the suspicious circumstance that appellant dismounted from the automobile a quarter of a mile or so from the building before the fire and that he was seen "coming from the direction of the Grotto" at or near the time the fire started. These facts are not inconsistent with the hypothesis that he is innocent or irreconcilable with his innocence. There is no evidence that he went in the direction of the Grotto after he got out of the car or that he was seen at or close enough to the Grotto to have started the fire. The distance between him and the Grotto at the time he was seen "coming from" the Grotto is not established. No connection was established between appellant and the sounds of the breaking of glass. Appellant's erratic route, which might be interpreted as an effort to avoid a confrontation with the fisherman, is a suspicious circumstance, but it is not necessarily incriminating or inconsistent with his innocence. Appellant and his companions were out on a drinking excursion. One of his companions had been arrested for speeding prior to the trip to Vernelle's.

Appellant and Jackie were arrested and jailed for public drinking later in the afternoon. His peculiar maneuver in apparently circumventing the fisherman could be attributed to many things other than a consciousness of guilt of arson. "Mere suspicion, however strong, will not supply the place of evidence when life or liberty is at stake." State v. Jones, supra, 17 S.W., l.c. 369. There is a complete absence of proof that appellant had any motive, malice or ill will toward the owner of the building to account for his having set this fire. The only factor which might implicate appellant as an arsonist is that of possible opportunity, and that is not enough to sustain a conviction of arson. State v. Odum, Mo.Sup., 351 S.W.2d 10, 15[3]; State v. Paglino, State v. Paillou, and State v. Morney, supra; State v. Ruckman, 253 Mo. 487, 161 S.W. 705. "Evidence that an accused had an opportunity to commit a crime, or which merely raises a suspicion and gives rise to conjecture, is insufficient as the basis for a judgment of conviction." State v. Castaldi, Mo.Sup., 386 S.W.2d 392, 395[1].

The State's evidence having been flimsy, insubstantial and insufficient to sustain a conviction of arson, the judgment is reversed, and in view of the fact that there is no indication that the State could make any better case on remand, the defendant is ordered discharged.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and McMILLIAN, Special Judge, concur.

BARDGETT, J., not participating because not a member of the court when case was submitted.